## LOVEJOY *v.* SPAFFORD ET AL.

1.  A., having had no previous dealings with a firm, but having heard of its existence, and who composed it, sold goods to one of the partners, and received in payment therefor a draft by him drawn upon the firm, and accepted in its name. At the time of the transaction the firm was, in fact, dissolved; but A. had no notice thereof. *Held,* that, in order to protect a retired partner against such acceptance of the draft at the suit of A., evidence, tending to show a public and notorious disavowal of the continuance of the partnership, is admissible.

2.  It is not an absolute, inflexible rule, that there must be a publication in a newspaper to protect a retiring partner. Any means of fairly publishing the fact of such dissolution as widely as possible, in order to put the public on its guard, — as, by advertisement, public notice in the manner usual in the community, the withdrawal of the exterior indications of the partnership, — are proper to be considered on the question of notice.

ERROR to the Circuit Court of the United States for the District of Minnesota.

The testimony, as exhibited by the bill of exceptions, is set forth in the opinion of the court.

The court below charged the jury as follows: —

"The facts in this case are, in the main, undisputed. The plaintiffs seek to hold the defendant, Lovejoy, for the payment of two acceptances of J. B. Shaw & Co. To establish his liability, the plaintiffs must show that Lovejoy was a member of the firm of J. B. Shaw & Co., and was a joint promisor, or that, having ceased to be a member of the firm, he still remained liable for obligations made in the name of the firm, by reason of failure to give proper notice of the dissolution of the firm to the public. Had he been a member of the firm when the acceptances were given, there would be no doubt of his liability. It is material for you to decide whether credit, on the sale of the lumber at Reed's, was given to J. B. Shaw alone, or to J. B. Shaw & Co. If to Shaw alone, then Lovejoy would not be bound. From 1868 to May 12, 1870, Lovejoy was a member of the firm of J. B. Shaw & Co. This is not disputed. It also appears that, on May 12, 1870, the firm was dissolved. Plaintiffs claim, notwithstanding the dissolution, Lovejoy is liable, because the lumber was sold on the credit of the company, and no notice given them of any dissolution. If you find that the sale at Reed's was, in fact, made to the firm, and that the plaintiffs, in making such sale, gave the credit to the firm of J. B. Shaw & Co.,

and relied on such credit, then Lovejoy cannot escape liability unless he has given legal notice. Many interesting questions, as to what is proper notice to persons who have not been dealers with the firm which has dissolved, have arisen in this case. It is not necessary for me to go to the extent of those authorities which hold that, in cases of dissolution, in order to avoid liability on the part of retiring partners to strangers, that there must be actual notice, or public notice by advertisement in a newspaper. I do not say that these are the only kinds of proper notice that might be given. In this case, there is no evidence of any public notice; for private communications made to particular persons at the place where the firm did business, or elsewhere, is not sufficient notice to bind other persons.

"There are two questions for you to decide : —

"*First*, Was there such a firm as J. B. Shaw & Co., and was Lovejoy a member thereof up to May 12, 1870? This is undisputed.

"*Second*, Did plaintiffs, or their assignees, as in the case of the Mead draft, have reasonable knowledge or information that the firm of J. B. Shaw & Co. still existed at the time the lumber was sold? Knowledge obtained from public notoriety, and from individuals who had knowledge thereof, was sufficient to warrant the plaintiffs in such a belief. If the evidence warrants you in finding that Angell or Mead had reason to believe that the dissolution had taken place at the time of the sale, then the plaintiffs cannot recover. Now, has there been any actual notice or public notice? Without public notice or actual notice, good faith makes Lovejoy responsible, and he cannot escape if the credit was given to the firm. Angell and Mead were in possession of the property. As to the arrangement with other parties, as testified to, it is not material in this case. One partner can bind the firm in a transaction for the benefit of the firm, and the other partners would be responsible for his acts. In this case, J. B. Shaw accepted these drafts in the name of J. B. Shaw & Co.; and if the credit was given to the firm, and Lovejoy had omitted to do any thing to relieve himself from liability, then he is still responsible."

To the following portions of this charge the defendant duly excepted, and his exception was noted, viz. : —

"If you find that the sale at Reed's was, in fact, made to the firm, and that the plaintiffs, in making such sale, gave credit to the firm of J. B. Shaw & Co., and relied on such credit, then Love-

joy cannot escape liability, unless he has given legal notice of the dissolution of the firm.

" In this case, there is no evidence of any public notice ; for private communications made to particular persons at the place where the firm did business, or elsewhere, is not sufficient notice to bind other persons.

" Did the plaintiffs, or their assignees, as in the case of the Mead draft, have reasonable knowledge or information that the firm of J. B. Shaw & Co. still existed at the time the lumber was sold ? Knowledge obtained from public notoriety, and from individuals who had knowledge thereof, was sufficient to warrant the plaintiffs in such a belief."

The defendant requested the court to charge the jury as follows : —

" 1. The evidence in this case shows that the firm of J. B. Shaw & Co. was dissolved, and that the defendant had withdrawn therefrom on the twelfth day of May, 1870, more than four months before the lumber was purchased from plaintiffs, or their assignees, and the bills of exchange in suit given and accepted.

" 2. That, at the time said bills of exchange were given and accepted, said J. B. Shaw had no authority to accept the same in the name of the previous firm so as to bind the defendant by such acceptance.

" 3. The evidence shows that none of the persons selling lumber, for which these acceptances were given, had had any dealing with J. B. Shaw & Co., during its existence, and that they were not, at the time said firm was dissolved, entitled to any notice of the dissolution.

" 4. When J. B. Shaw applied to purchase the lumber, and represented that he had authority, as partner, to bind the defendant, those having the lumber to sell were bound to inquire as to the fact, whether he had such authority or not, in the absence of previous dealings. And, if the fact of the dissolution of the firm was so publicly and generally known that the jury believe that a reasonable inquiry by the persons selling the lumber would have disclosed the fact of the dissolution, and that they neglected to make any reasonable inquiry, the defendant is not bound.

" 5. If the jury find that the fact of the dissolution of the firm of J. B. Shaw & Co. was made known to the business men engaged in the same business as those who sold the lumber to Shaw, in the town where they resided and did business, and was so communi-

cated as to be likely to come to their knowledge, the jury may infer that fact, if they believe it, from the evidence and circumstances.

"6. That, as the persons selling the lumber in this case had not had any dealings with the firm of J. B. Shaw & Co., during its existence, they were not justified in presuming that defendant was a member of that firm, on the statement of any one or two persons who are not shown to have ever had any dealing with that firm during its existence.

"7. That, as to persons who had never dealt with the firm of J. B. Shaw & Co., the defendant, on the dissolution of that firm, was not bound to give notice directly of such dissolution. Neither was it absolutely necessary that notice of the dissolution should have been published in any newspaper, in order to protect Lovejoy against persons who had never dealt with the firm. The jury are at liberty to consider, from the generality and extent to which knowledge of the fact of the dissolution had been spread, especially in the vicinity where the plaintiffs and their assignees lived and did business, and from the lapse of time occurring after the dissolution, whether notice of the dissolution had not reached the plaintiffs, or their assignees, or would not have been ascertained upon such inquiry as they were reasonably bound to make.

"8. If the jury believe that the purchase of lumber, by Shaw, was made for his own benefit alone, and this was known to the sellers, or there were circumstances connected with the sale from which they ought to have known this, the defendant is not bound.

"9. That the fact, that Shaw drew the acceptances in his own name, as drawer, is a circumstance which tended to show that the purchase was for his individual benefit, and that the draft, on the face of it, was for his own funds in the hands of the drawee."

In reference to such requests of the defendant, the court charged as asked in the first and the second, with the qualification that it was true if he had given legal notice of the dissolution of the firm, and eighth requests; but as to all the other requests and every of them the court said, " I have already stated to you all the law which I deem applicable to this case, and therefore decline to charge as requested by the defendant," and declined to give any of said requests except the first and second as above, and eighth; and the defendant duly excepted, and his exception was noted, to the refusal of the court to give each of the requests so refused severally.

The jury retired to consider their verdict, and afterwards came into court for further instructions, in response to which the court said, " The first proposition which I charged you was, that there is no dispute that the partnership existed in 1868 and 1869, and that it was in fact dissolved May 12, 1870. So far as Lovejoy is concerned, unless he had done something to bring public or actual notice of the dissolution to these plaintiffs or their assignors, or had given public notice of the dissolution, he would continue liable, and cannot escape, if you are satisfied credit was given to the firm." To all that portion of the charge which follows after the words and figures " May 12, 1870," the defendant duly excepted, and his exception was noted.

The jury returned a verdict in favor of the plaintiffs; judgment was rendered thereon. The defendant then sued out this writ of error.

Argued by *Mr. William Lockren* for the plaintiff in error. Submitted on printed arguments by *Mr. W. O. Bartlett* for the defendants in error.

MR. JUSTICE HUNT delivered the opinion of the court.

The action was by the holder of two drafts dated Sept. 27, 1870, drawn by J. B. Shaw upon J. B. Shaw & Co., and accepted in the name of J. B. Shaw & Co. The object of the action was to charge Lovejoy as a partner. The firm of J. B. Shaw & Co. was formed on the fifteenth day of April, 1868; transacted a lumber business at Davenport, Iowa; and continued until the twelfth day of May, 1870, when it was dissolved by an instrument in writing. In fact, Lovejoy was not a member of the firm of J. B. Shaw & Co., nor was there in existence such a firm when the drafts were accepted in its name. The acceptance in the firm name was a fraud on the part of Shaw.

The questions arising upon the bill of exceptions grow out of the sufficiency of the notice of the dissolution of the firm given by the retiring member.

Formal notice was given to all those who had previously dealt with the firm. It does not appear whether there had been any change of signs, nor whether the firm had any external sign.

No evidence was given that notice of the dissolution was pub-

lished in any newspaper; and it was proved that two daily papers were published in Davenport at the time of the dissolution. After that time the business was carried on in the name of J. B. Shaw alone.

Prior to the present transaction, the plaintiffs, in discounting its paper, had heard of the firm, and who were its members. They testified that they had no information of the dissolution till some time after its occurrence.

The drafts in suit were given for lumber sold by the plaintiffs and by one Mead, were drawn by Shaw, and accepted by him in the name of the firm at Read's Landing, where the lumber was sold.

There was no evidence that the firm had ever had any other transaction at Eau Claire or Read's Landing.

No evidence was given of the relative position of the places in question; but from the maps and gazetteers we learn that Eau Claire is in the interior of the State of Wisconsin, and distant several hundred miles from Davenport, in the State of Iowa. Read's Landing is not far from Eau Claire.

The case was tried by the Circuit Court, upon the theory, that to discharge a member of a firm from the claim of one who had had no dealing with it prior to its dissolution, but who knew of its existence and who were its members, it was necessary that the latter should have received actual notice of the dissolution, or that notice should have been published in a newspaper at the place of business. This doctrine was not announced in terms, but such was the result of the trial. Either of these notices was held to be sufficient; but it was held that, without one of them, the retiring member could not protect himself. In terms, the holding of the judge was, that there must be either actual notice or public notice; and it will be seen from the offers and exclusions presently to be stated, that this public notice could mean only a newspaper publication.

Thus the witness Barnard, after testifying that he had been in business at Davenport prior to May 12, 1870, until the time of the trial; that he had business relations with all the lumber dealers at that place, and knew them all; and that he knew of the dissolution when it occurred, — was then asked whether or

not it was generally known at Davenport at the time the firm was dissolved that such dissolution had taken place.

To which the plaintiffs objected, on the ground that the same was incompetent and immaterial; which objection was sustained, and the defendant Lovejoy excepted, and his exception was noted.

Defendants' counsel then asked the witness : "State whether or not it was generally known at this time along the river that this dissolution had taken place."

To which plaintiffs made the same objections as before; and the objection was sustained, and an exception taken by defendant Lovejoy, and noted.

Defendants' counsel then asked the witness : "Did you at or near the time of the dissolution communicate the fact that it had occurred to any persons other than the plaintiffs; and, if so, to whom, and in what manner ? "

To which the plaintiffs made the same objection as before; which objection was sustained, and an exception was taken and noted for the defendant Lovejoy.

Counsel for defendant Lovejoy stated, in connection with the questions to the witness Barnard, that he did not expect to prove actual notice of the dissolution to the plaintiffs, or to the persons who sold the lumber.

John C. Spetzler was sworn as a witness in behalf of the defendant, and testified that in May, 1870, he was in the employment of J. B. Shaw & Co., in their yard at Davenport, as salesman; that the business was conducted after the dissolution by Shaw, in the name of J. B. Shaw.

The defendant proposed to prove by the witness that the dissolution, immediately upon its occurrence, was a matter of general repute and knowledge in the city of Davenport, where the firm did business, and that all lumber dealers in Davenport were informed of it.

To which plaintiff objected, on the grounds that the same was incompetent and immaterial; which objection was sustained. To which the defendant Lovejoy excepted, and his exception was noted.

Sumner W. Farnham, not a partner, was sworn on behalf of the defendant, and testified, that, in September, 1870, and

before the transaction in question, he visited Eau Claire in company with J. B. Shaw; was there two or three days, and called on the lumber dealers of that place. The witness was then asked whether on that occasion he or Shaw gave any notice to the lumber dealers at Eau Claire of the dissolution of the firm of J. B. Shaw & Co. If so, to whom, and in what manner?

To which the plaintiffs objected, on the grounds that the same was incompetent and immaterial, unless the defendant proposed to prove actual notice to plaintiffs, or to those who sold the lumber, or notice by publication in a newspaper. The objection was sustained by the court; and the defendant Lovejoy excepted, and his exception was noted.

The defendant then offered to prove by this witness, that, while he and Shaw were at Eau Claire on this occasion, and before the sale of the rafts in question, the said Shaw, in the presence of the witness, notified all, or nearly all, of the lumber dealers in Eau Claire, where plaintiffs then lived and did business, and in the vicinity, that the firm of J. B. Shaw & Co. had dissolved, and that Farnham & Co. had sold out to Shaw.

To which the plaintiffs objected, on the grounds that the same was immaterial and incompetent, unless the defendant proposes to show actual notice to the plaintiffs, or to those who sold the lumber; which objection was sustained, and the defendant Lovejoy excepted, and his exception was noted.

In *Pratt* v. *Page*, 32 Vt. 11, cited as an important case, it was held, that, to entitle a plaintiff to recover in a case like the present, these facts must appear: 1. The claimant must have known at the time of making his contract that there had been a partnership. 2. That he did not then know of its dissolution. 3. That he supposed he was entering into a contract with the company when he made it. In the court below the plaintiff recovered, on the ground of want of sufficient notice of dissolution; but in the appellate court that question was not reached.

In *City Bank of Brooklyn* v. *McChesney*, 20 N. Y. 240, the bank having had previous knowledge of the existence of the firm of Dearborn & Co., of which the defendant, McChesney, was a member, discounted a note made in the firm name, but after the partnership was in fact dissolved, without knowledge

or information on the part of the bank; it was held, there being no publication of dissolution, that the retiring partner was liable. The court makes no examination of the law, but adopts as the basis of its judgment the opinion of Senator Verplanck in *Vernon* v. *Manhattan Company*, 22 Wend. 183.

In that case, Senator Verplanck made use of this language: "Now, following out this principle, how is a person, once known as a partner, to prevent that inducement to false credit to his former 'associates which may arise after the withdrawal of his funds, from the continued use of the credit which he assisted to obtain? How shall he entitle himself to be exempted from future liability on their account? The natural reply is, He must take all the means in his power to prevent such false credit being given. It is impossible for him to give direct notice of his withdrawal to every man who may have seen the name of his former firm, or have accidentally received its check or note. No man is held to impossibilities. But he does all he can do in such a case by withdrawing all the exterior indications of partnership, and giving public notice of dissolution in the manner usual in the community where he resides. He may have obtained credit for his copartnership by making his own interest in it known, through the course of trade. So far as those are concerned who have had no direct intercourse with the firm, he does all that is in his power to prevent the continuance and abuse of such credit, if he uses the same sort of means to put an end to that credit which may have caused it. But there are persons with whom he or his partners may have transacted business in the copartnership name and received credit from. To such persons he has given more than a general notice of the partnership; for he has directly or indirectly ratified the acts of the house, and confirmed the credit that may have been given, either wholly or in part, upon his own account. He knows, or has it in his power to know, who are the persons with whom such dealings have been had. Public policy, then, and natural justice, alike demand that he should give personal and special notice of the withdrawal of his responsibility to every one who had before received personal and special notice, either by words or acts, of his actual responsibility and interest in the copartnership. Justice requires that the severance of

the united credit should be made as notorious as was the union itself. This is accomplished by the rule that persons having had particular dealings with the firm should have particular notice of the dissolution or alteration, but that a general notice, by advertisement or otherwise, should be sufficient for those who know the firm only by general reputation." Both the Senator and the Chancellor, and the court in McChesney's case, agree in the opinion that persons who merely take or receive for discount the paper of a firm are not to be deemed dealers with the firm, so as to be entitled to actual notice.

In *Bristol* v. *Sprague*, 8 Wend. 423, which was an action against a retired partner upon a note made after the dissolution, Nelson, J., says, " It is well settled that one partner may bind another after dissolution of the firm, if the payee or holder of the note is not chargeable with notice, express or constructive, of the dissolution of the partnership (6 Johns. 144; 6 Cowen, 701); and that such notice must be specially communicated to those who had been customers of the firm, and as to all others by publication in some newspaper in the county, or in some other public and notorious manner."

In *Ketcham* v. *Clark*, 7 Johns. 147, Van Ness, J. said, " In England, it seems to be necessary that notice should be given in a particular newspaper, the ' London Gazette; ' but we have no such usage or rule here. I think, however, we ought at least to go so far as to say that public notice must be given in a newspaper of the city or county where the partnership business was carried on, or in some other way public notice of the dissolution must be given. The reasonableness of it may, perhaps, become a question of fact in the particular case."

Mr. Parsons, in his Treatise on Partnership, pp. 412, 413, gives this rule : " In respect to persons who have had dealings with the firm, it will be necessary to show either notice to them of a dissolution or actual knowledge on their part, or at least adequate means of knowledge of the fact. As to those who have not been dealers, a retiring partner can exonerate himself from liability by publishing notice of the dissolution, or by showing knowledge of the fact." He adds : " A considerable lapse of time between the retirement and the contracting the new debt, would, of course, go far to show that it was not, or

should not have been, contracted on the credit of the retiring partners."

Mr. Justice Story, in his work on Partnership, says, the retiring partner " will not be liable to mere strangers who have no knowledge of the persons who compose the firm, for the future debts and liabilities of the firm, notwithstanding his omission to give public notice of his retirement; for it cannot be truly said, in such cases, that any credit is given to the retiring partner by such strangers." Sect. 160. In a note he discusses the doctrine as laid down by Bell and Gow, and adheres to the rule as above announced.

Mr. Watson says, that to dealers actual notice must be given; as to strangers, he says, " An advertisement in the ' London Gazette ' is the most usual and advisable method of giving notice of a dissolution to the public at large." Watson on Part. 385.

In his Commentaries on the Law of Scotland, Professor Bell, in speaking of a notice to dealers, says, " An obvious change of firm is notice; for it puts the creditor on his guard to inquire, as at first. So the alteration of checks or notes, or of invoices, is good notice to creditors using those checks and invoices." As to notices to strangers, he says, " As it is impossible to give actual notice to all the world, the law seems to be satisfied with the ' Gazette's ' advertisement, accompanied by a notice in the newspaper of the place of the company's trade, or such other fair means taken as may publish as widely as possible the fact of dissolution." The " Gazette " notice he holds to be one circumstance to be left to the jury. 2 Bell's Com. 640, 641.

In *Wardwell* v. *Haight*, 2 Barb. S. C. 549, 552, Edmonds, J., says, " The notice must be a reasonable one. It need not be in a newspaper. It may be in some other public and notorious manner. But whether in a newspaper or otherwise, it must, so far as strangers and persons not dealers with the firm are concerned, be public and notorious, so as to put the public on its guard."

In view of these authorities, we are of the opinion that the rule adopted by the judge on the trial of this cause was too rigid. We think it is not an absolute, inflexible rule, that there must be a publication in a newspaper to protect a retiring partner. That is one of the circumstances contributing to or

forming the general notice required. It is an important one; but it is not the only or an indispensable one. Any means that, in the language of Mr. Bell, are fair means to publish as widely as possible the fact of dissolution; or which, in the words of Judge Edmonds, are public and notorious to put the public on its guard; or, in the words of Judge Nelson, notice in any other public or notorious manner; or, in the language of Mr. Verplanck, notice by advertisement or otherwise, or by withdrawing the exterior indications of partnership and giving public notice in the manner usual in the community where he resides, — are means and circumstances proper to be considered on the question of notice.

When, therefore, the defendant proved that actual notice had been given to all those who had dealt with the firm; that all subsequent business was carried on in the name of the remaining partner only, thus making a marked change in the presentation of the firm; when the claimants received and obtained the draft at a distance of several hundred miles from the place where the firm did business, and there was no evidence that the firm had ever before transacted any business in that place, — we think the evidence offered should not have been excluded. When the defendant offered to prove that it was generally known along the Mississippi River that the dissolution had taken place, and offered evidence showing to whom, to what extent, and in what manner, notice had been given; that all the lumber dealers in Davenport were notified and knew of the dissolution; that at Eau Claire, on the occasion of the transaction in question, and before the drafts were made, notice was there given to all, or nearly all, of the lumber dealers in that place that the firm had been dissolved, — we think the evidence was competent to go before the jury.

The question is not exclusively whether the holders of the paper did in fact receive information of the dissolution. If they did, they certainly cannot recover against a retired partner. But if they had no actual notice, the question is still one of duty and diligence on the part of the withdrawing partner. If he did all that the law requires, he is exempt, although the notice did not reach the holders. The judge held peremptorily that there must be either actual notice or public notice, — in

·effect, that it must be through a newspaper, — and excluded other evidence tending to show a public and notorious disavowal. In this we think he erred.

He refused to admit evidence which would have sustained the fifth request to charge, that, if the notice was so generally ·communicated to the business men of Eau Claire as to be likely to come to the claimants' knowledge, the jury are at liberty to find such knowledge. In this we think he erred.

Without prescribing the precise rule which should have been laid down, we are of the opinion that the errors in the rulings were of so grave a character that a new trial must be ordered.

*New trial ordered.*